Alright, the Court will call the next case, In re Merck Mumps Vaccine Antitrust Litigation, Appellant number 23-3089. Good morning again, Your Honors, and may it please the Court, Jessica Ellsworth for the Appellant Merck. Merck was entitled to summary judgment in this antitrust suit for two reasons. First, this suit is about Merck's communications with FDA as FDA made decisions about how to regulate Merck's Mumps Vaccine. It's well established that a defendant is immune from antitrust liability under Norah Pennington for petitioning government officials to take or not take certain actions. You know, the petitioning is a really interesting point because usually you think of petitioning as a person going to the government asking for relief, not responding to government form 483s or warning labels or anything like this. I would get it if it's a petition that says, hi, we'd like a label to read this way or to do this. But here, they were much more respondents. Merck was much more respondent than petitioner. And so it feels strange to say, hi, we're in the heartland of Norah Pennington when I'm not sure there was petitioning activity that came on because you were just responding to what the government asked, not necessarily asking for your own affirmative relief through a traditional petition. What do you say? Your Honor, I'm not aware of any case, and the plaintiffs here haven't cited one, that draws the distinction Your Honor is asking about. Petitioning is broadly recognized under Norah Pennington to be an effort to influence a public official when that public official is doing their public duty. That petitioning activity can be intended to eliminate competition. It often is. In Norah itself, that was the very basis of the request for legislation that was being made there. So if an agency submits an administrative subpoena to a regulated party, the regulated party produces information back. Is that information, even if it later has anti-competitive activity, is that a petition? It might depend on the context of the administrative subpoena, in Your Honor's hypothetical, because the Form 483 and the warning letter response are in a very specific context, which is the agency says, we have some concerns and we want you to address our concerns and tell us what you're going to do about them. We're trying to decide whether we should take action or not. And so Merck responds to those and walks through, in part, the history of the negotiations between Merck and FDA about this label reinterpretation. Are those responses the precise petitioning that you allege occurred here? So, Your Honor, the petitioning that we allege is really the extended negotiations and communications between Merck and FDA. The only three things that the plaintiffs identified as falling within the sham exception, and it was their burden to invoke the sham exception and then show that both aspects of the test for the sham exception were met. They identified three things. They identified the warning letter response, they identified the Form 483 response, and they identified two of these deviation reports that gave FDA information about lots that did fall below the labeled potency once there was this new interpretation of the label. But apropos to what Judge Montgomery is asking you, are you trying to cloak your responses to those events, the FDA 483, the EPDR, and the warning letter apropos to what Judge Phipps was asking, is we want to know what you think is immunized, not what they think is the sham. We'll talk about sham, I'm sure, at some point. But what do you say is immunized? To say it's these general negotiations about the label, there has to be a petitioning event of some sort, as Judge Phipps was alluding to. So we're trying to fix what is the petitioning activity by Merck, and what communications are you contending should be cloaked with this immunity? We think all of the communications that Merck made to FDA in conjunction with what the plaintiffs say is their antitrust injury, which is not allowing GSK's product to come on the market sooner, because of things that were on Merck's label. So the petitioning activity is the communications that Merck made with FDA that go to the label. But when is that? They were labeling communications when the product hit the market in the 60s. We're trying to fix time. Sure. I think it is the communications that were in the late 1990s and early 2000s, the ones that are the basis for their complaint. And the reason, if we go back to kind of at its core, what is the reason for Norr-Pennington immunity? It's to ensure that the antitrust laws regulate business. They don't regulate citizens' participation in government, citizens' participation in being governed, and government decisions. The sham exception, though, you know, the Supreme Court goes out of its way. I'm a little perplexed by what they did, but that doesn't matter. They go out of their way to say that the sham exception is kind of at its height when we're in something that's more adjudicatory as opposed to regulatory. And it seems that this feels like something that begins to get a little bit more adjudicatory when you're just trying to decide, is this a good label? Is this the right label? How does this label work? You know, I mean, you know, we've got these doctrines of legislative fact, adjudicative fact. Legislative fact is a fact used to make law. Adjudicative fact is a fact used to apply law. And so when we want to talk about the sham exception, it seems that the more that you're talking about adjudicative facts in an adjudicative manner, the more likely that we can show sham. And you say, no, no, no, none of this is adjudicative. But it strikes me that you want adjudication where the label should change. Your Honor, when courts have looked at the difference between what is adjudicatory and what is non-adjudicatory for purposes of applying Norr Pennington, they have looked at things like, is the agency actually doing its own investigation, making policy-laden decisions, or is it applying an existing body of law to an existing set of facts and then issuing a written decision so that a court can later make the kind of determinations that are necessary to find the sham exception would apply. And here I think there are a number of indications that this would fall on the non-adjudicatory side of the line. And if I could just walk you through some of them. There's no way for a court to assess when FDA took no action in response to the Form 483, the warning letter, and the BDPRs. There's no way for the court to assess whether that was because the agency recognized that three decades of the lower release potency had eliminated 99 percent of mumps in this country. There's no way to know whether really the entities at FDA that had issued the warning letter and the Form 483, the left hand talked to the right hand, and FDA realized that the agency itself had moved the goal post with its new label interpretation. FDA may have gone back and looked at the release potency for the earlier lots. It may have looked at its own stability testing data. It may have recognized the worst-case scenario. Counsel, though, the warning letter said if Merck didn't comply, they could consider, I'm going to use very plain language, yanking the license. I don't know how you can say that that is a ministerial act as opposed to an adjudicatory act. They were making a decision, come forth, answer our concerns, or face this sort of consequence, and they were going to exercise their discretion as to whether they were satisfied with the response. I find it difficult to find that that's not an adjudication, a decision subject to the discretion of the agency on the facts in front of it as opposed to the ministerial, is it going in the orange book for a patent case or not. Your Honor, at the end of the day, I really don't think it matters whether this is adjudicatory or non-adjudicatory because the plaintiffs agree that there is a two-step test that gets applied. And the first step of that is whether Merck's petitioning activity was objectively baseless. If that's not met, then you don't even get to the second step. Okay, let's go to objectively baseless. The district court didn't say Newell-Pennington immunity didn't apply. It simply said there are too many factual disputes for the court itself to decide if the factual assertions Merck was making were objectively baseless and just sent that to the jury. Why was the district court wrong in doing that? So in both Cheminor, this court, and in Mercatus, the Seventh Circuit said whether the parties agree on whether there was a misrepresentation does not prevent summary judgment on this first objectively baseless point. Now, let's assume that Merck could have included more information. Is it objectively baseless to have asked the agency to take no action at the time that Merck did? And the answer to that is plainly no. It was not objectively baseless. We have a record that we have to construe disputed facts in favor of the non-Mouvant plaintiff, and one of them is an assertion that one of the communications could be read to suggest that Merck knew had they disclosed a little bit more information, maybe that might have impacted the FDA. I think you probably know which communication I'm referring to. And so I don't know how we could say there's not some sort of dispute for the jury to decide when Merck itself could be inferred to have had information that it knew might have impacted the FDA's decision-making. So, Your Honor, I want to answer that very briefly and then move to the second step as well. But I think one of the things we were talking about in the first argument in this case is the Kessler submission. And so if you want to look at whether or not the agency would have done anything different, we have the benefit of hindsight, and we know now that the agency wouldn't have done anything different. It hasn't required a trace back. It hasn't expressed any concern to Merck based on that. So I think that is a problem for their objective baselessness argument. But even if we just look at the second step, and what Armstrong did, what this court did in Armstrong is say, I don't have to determine objective baselessness, because even if it was objectively baseless, the plaintiff's claim there would fall under the second step. And I think that's true here as well. What's objective intent? Subjective intent, because what the Supreme Court said in the PRE case is that if the plaintiff's complaint is about the outcome of petitioning activity rather than an abuse of process itself, then the sham exception invocation falls under step two. Let me ask you about the outcome of the petitioning activity. Could Merck say anything on the label that the FDA hadn't approved? No, it could not. And I think that's important because one of the arguments that's sort of strange to me that the plaintiffs make is they somehow suggest that Merck just privately engaged in sort of private commercial activity to decide to print up these misleading labels and slap them on its vaccine. That blinks reality of what the FDA approval process is for labeling. Every single statement on that label was one that FDA approved. And under Section 355.04a, which the district court cited, FDA actually has an obligation, if it is aware of new information that bears on a reduced effectiveness or a safety concern, to require a change to the label. And FDA has not done that at any point until this day. What if we ignored all the communications with the FDA, every single one? We don't consider one of them. And we only look at Merck's internal communications, regardless of why they were created, just they made them because there's no petitioning activity for talking amongst yourselves. And we know from a reading of those materials in a light, I know you disputed it, in the light, viewing those facts as if resolved for plaintiff, it suggests we got an issue here. If we don't take some action, or if we take a particular action, it may lower the bar of entry for our competitors. And there was a little task force created, and there's a lot of other indicia in the record that suggests that Merck was attempting to block entry of GSK. Why isn't that enough to go to a jury? Now, I know your response to that, well, there was other explanations in the GSK materials concerning their reasons for why they made certain decisions, paused research, et cetera. I'm being circumspect, obviously, about that. They're a non-party here. But I think we both understand. I think our adversaries will understand what communications I'm referring to. If that were the whole case, isn't that enough for a jury to consider whether there was a Sherman Act violation here? Your Honor, I understand the plaintiff's invocation of those Merck internal documents to be about causation, which is separate from Norr Pennington. And I'm happy to address it. Forget about Norr Pennington and any talk to the government, and just focus on somehow there was an insider who decided to share all of those internal communications with whomever, and there was, holy heavens, there looks like some communications that might reflect anti-competitive behavior. An effort to keep a competitor in the market off, and the concerns that were held by those on the science side as well as the business side. Why isn't that enough for this case to go to a jury? The answer to that is very straightforward, Your Honor. And it's because antitrust injury looks to connect a link between the plaintiff's asserted injury and the anti-competitive conduct. And here we have a case that has a regulatory bar. So in order to show that link, it's not Merck's internal documents that matter at all. What matters is whether there's any evidence that GSK would have used a different development timeline for its Priorix product, and whether FDA would have approved at a different time the Priorix product. But they know from the information that the information on the public-facing label that GSK had to hit in order to get permission was not what Merck, if you believe the documents, if a jury were to believe them, was not what Merck understood was not accurate. And so GSK was also operating to meet a label requirement that, in fact, Merck says, in reality, we're not really meeting. Your Honor, GSK's witness was explicit in saying that nothing on the label foreclosed GSK's development. And I think that's really important. The district court didn't deal with that testimony, and the plaintiffs ignore that testimony on appeal. But the GSK witness identified were five reasons and said they were the exclusive, exhaustive list of reasons. But they didn't know that the label was not, from a point of view based on their, if they knew about what internally was going on, that might have been the reason why they were making those decisions about not investing in their own product. Well, let's add to that. Didn't the same witness testify that they designed their labels to ensure that they could get to the same label? They did. And that same label would have had, go ahead and finish up. They did. They designed their label, and the witness said this, we wanted to mirror Merck's label. What they needed was an assay that was sufficiently optimized, sufficiently enhanced to be able to get that showing. Now you can see in the record that Merck spent a tremendous amount of time and energy working with FDA to develop the ELISA assay, which is what Merck used to get that seroconversion rate and used in Protocol 7. GSK didn't prioritize creating that kind of sensitive assay. GSK was worried about whether the market was going to be for trivalent or quadrivalent vaccines. They were debating whether there would be low sales, would this be profitable, should they be an adult vaccine company. Those are the reasons that GSK gave. And then we also have the FDA side of it. And I know my time is up, but if I may just briefly address the fact that they lack evidence that FDA would have approved Priorix on any different timeline. There's no evidence in the record that any inflated statement on the label affected the timing of FDA's approval. And we know, because of 355.04a, that FDA stands by that seroconversion rate that's on the label today. It's on GSK's label, it's on Merck's label. The issue really was getting that assay. That makes this case like Wellbutrin, in which this court affirmed summary judgment for lack of a triable fact on causation injury. Let me just, you know, this causation point's interest, Wellbutrin patent case, right? But so I get the notion that you can say, hey, there was independent government action, and it's the independent government action that interrupts the causal chain needed for antitrust standing, antitrust injury, the antitrust case. And the cases that we see where there has been the invocation of government action has been when there's been largely independent government action. When the government acts, for instance, to license statements, to require bar exams or not bar exams, that's kind of independent from whether the ABA or whoever licenses a law school. The government's not overseeing that. But in this case, it seems that you've got government action where it's government as regulator as well. And so it strikes me that it's harder to say, oh, hey, the government's completely independent, and that their action is completely independent for interfering with antitrust causation when they kind of wear two hats. They make the final decision, but then they interface all of the time with the regulated party. I don't think Wellbutrin went that far. I don't think that Massachusetts School of Law goes that far. And so you're kind of asking us to say, hey, in a highly regulated industry, there's still, it's still independent enough to break the chain of causation. Your Honor, I don't think that we're asking you to do anything different from what this court has done in the Wellbutrin case, in the Soundship case, what the Fifth Circuit did in the Chandler case. And the one I think I would point the court to most specifically is the greater Rockford case from the Seventh Circuit, where the court found it granted summary judgment for lack of antitrust injury. And it found there were many explanations for the injury other than the one that the plaintiff had asserted. And it's standing alone. One of those might be insufficient to put causation in question, but taken together, no reasonable jury could find for the plaintiffs. That's very similar to what we have here, where you have a GSK corporate representative saying there are five and only five reasons that we didn't develop this product earlier. And then you also have a lack of evidence of what would have happened by FDA. And I think the Wellbutrin case sets a very clear standard for what it means to show that something would have happened differently. If I could just, for one second, to answer your question. Yeah, if you could just answer Judge Phipps' question. Yeah, because I'm most interested in the regulatory nature. Wellbutrin is patent approval. This is approve the overfill, not taking regulatory action. And so the pre-overfill law, it's approving the MMR2 label. All this is highly, highly, highly regulated. I mean, you say it's completely independent, but I don't think they made that completely independent decision without checking in with Merck and relying on some of Merck's data. And so when you want to say that we have this independent intervening cause that breaks any antitrust problem, like it doesn't feel quite as independent when kind of agency and regulated entity work so closely. Or at least are regulated so closely. Your Honor's question seems to suggest, and maybe I'm mishearing it, that FDA was working with Merck when it reviewed the GSK approval for Priorix, and that's not right. FDA certainly regulated... So you think that we should just focus injury entirely on causation, entirely on GSK's claim of delayed entry? Absolutely, because that's what the plaintiff's claim of injury is based on. Their claim of injury requires them to show that GSK would have come on the market earlier with its competing product. And so that requires them to show two things. One, that GSK would have acted differently. So GSK would have submitted its application to FDA at a different point in time. And then two, that FDA, in evaluating that GSK application, would have approved Priorix on a different timeline. That is entirely separate from FDA's regulation of Merck. Counsel, we'll have you back on the bottom. Thank you very much, Your Honor. Good morning, Your Honors. Deepak Gupta for the Plaintiff's Appellees. The District Court correctly declined to grant summary judgment to Merck on Merck's and on the issue of antitrust causation, finding genuine issues of material fact on both issues. To reverse that careful, fact-based ruling, Merck must show that no reasonable jury could find for the plaintiffs on their monopolization claim under the Sherman Act. And Merck must attempt to do so based on the case that we will actually present to the jury, not on a different version of our case that Merck hypothesizes. Could you prove your case without any communications between Merck and the FDA? Yes, we could. You could go forward and prove every element of your antitrust violation without? Yes. And I think that's one reason why you can sidestep the Norm Pennington issue. We think it would be useful guidance to the courts to reach the issue, but you don't need to because our case turns not on the back and forth with the FDA, but on Merck's scheme to misrepresent the benchmark for market entry. And critically, Merck made those misrepresentations to the public on its label and therefore to its competitors. Merck made those misrepresentations on the label without the FDA approving it. Could Merck decide what goes on the label without FDA approval? Yes. So what happened is this label was approved in 1967. We have no quarrel with the label as it was approved in 1967. The problem is that Merck recognized during the period that's relevant to this case, which is the late 90s into 2012, that it couldn't sustain those claims, that those claims were incorrect. And it had internal debates. These are the documents that Judge Schwartz was referring to about whether to do the right thing, whether to come clean and tell the scientific community and the public and therefore its competitors that it could not sustain those claims. But it knew that the problem was that that was also the benchmark for market entry. And so Merck convened and created a competitive defense task force starting in 1996. And the objective of that task force, you don't have to take our word for it, you can take Merck's internal word for it, was to, quote, delay the launch of Priorix into the market. And then Merck understood and recognized to itself that that scheme had succeeded, that Priorix wasn't granted approval and that the competitive defense task force was largely responsible for this because it was able to distinguish based on the zero conversion claim, the 96 percent claim, and the shelf life claims that Merck knew to be false, that it could keep GSK and indeed did keep GSK off the market based on those claims. And that's all public. That doesn't have to do with the back and forth with the FDA. We do think that the back and forth of the FDA with the FDA shows the extent and the lengths to which Merck was willing to go, and it's corroborating. But as, you know, your question, Judge Schwartz, is if you take all of that out, can we show causation? Do we prove our case? I would go further and say the heart of the case is not the back and forth with the FDA. What if we made a representation on here in the record? I'm not asking you to do it. But if you made a representation, you know, we are ready to go try this case. We will not introduce any of the communications with the government actors. If that were your representation, should we be remanding this for the district court to now review the record as if none of those communications occurred to determine whether antitrust causation, antitrust injury, et cetera, could be sustained? Well, no, because I don't think you need to do that. And I think, you know, the trial lawyers would be upset with me if I just gave up all of that evidence because it's very strong evidence, right? And so but I think my point is that the gravamen of the case, the weight of the evidence in the case, is not about that back and forth. And I think there's a Seventh Circuit case by Judge Hamilton that I think is helpful on this point. It's the Mercatus case. And it talks about when you have some defense that, you know, some of the evidence or some of what's going on involves alleged petitioning, it does not mean that that tanks the whole case. You have to see whether the weight of the evidence is not petitioning. Let's talk about petitioning. I'm sorry. Go ahead, Judge Brooks. So, you know, a lot of what you talk about kind of Merck's own statements, it strikes me that the anti-competitive angle is collateral. Like they want to they what they really want to do is not have their product suspended, withdrawn, or pulled from the shelves. Now, and therefore they want the label and they're overfilling and all their efforts to kind of keep their product there. Now, incidentally, and collateral to all that, that may have downstream effects on competitors and everybody else like this. But it strikes me as a little strange to say, wait, wait, the best way to view this, you know, there's a huge dispute of fact when it strikes me that the number one reason Merck was doing this wasn't to bar GSK, but to keep its own product on the shelves. I think, Your Honor, I think that's wrong. And I think the best way to understand why it's wrong is to look at the case chronologically. This happens to be a case that involves a really lengthy period of delay, more than a decade. But imagine it was a more modest case. Imagine it was a case that concerned the convening of the Competitive Defense Task Force in the late 90s, up until the point where the first warning letter, the first form comes from the FDA. So we're just looking at that period of time. What you just said, you couldn't possibly say about that period of time, right? But it is clear that Merck was engaging in this effort through its Defense Task Force to make statements, not just, you know, to the scientific community, to the public, to competitors, that it could maintain the zero conversion claims and the shelf claims. And one example of this, and this is cited at page 24 of our brief, is a letter to the editor that Merck's scientists wrote to a journal on pediatric immunology. And they questioned whether or not you could correlate the PRN and the ELISA assay for the GSK competitive. They said, These things are not equivalent. We can do that correlation for our vaccine, and GSK can't do it. They knew at the very month, we have record evidence, in the very month that they were saying that publicly, they knew that not to be true. Their scientists were questioning whether they could maintain that. None of that has anything to do with the FDA threatening their license. That comes later. But that just shows the extent to which this, you know, campaign took place. It took place over many, many years. So you're really talking like 96 to 2000 is the heart of your case, as opposed to kind of after the Form 43 and everything else like that comes out starting 2000. I think the year 2000 is the key year. That's when most of the public statements are really ramping up. But it goes all the way through 2012. I mean, GSK is in the dark until 2012, when they're able to finally get the clinical trials approved, because they're able to use this Merck ELISA. So your friend on the other side says, not so. Say, we've got five statements. These are the five reasons. And, in fact, not only do we have five reasons, but guess what? We've got even better. We closed the door on any other reason. So, I mean, that's nice file work to get five reasons and then close the door on any other, right? And so they're really trying to parlay that. What do you say in response? Yeah, so I have a couple of responses, as you might imagine. I think the district court got it right to say, look, there's a whole lot of evidence, contemporaneous documents from within Merck and GSK, unrebutted expert testimony about causation, and all of that in the summary judgment mix counts for quite a lot when we're looking at this deposition testimony. But I also have an answer that's chronological, which is to look at when this deposition occurred and the limitations on that deposition testimony, because they're really relying on one deposition. It's the deposition of April Cohen. And that took place in 2018. But at the time that that deposition took place, this is really, I think, important for the panel to understand, GSK and Cohen were unaware of the key facts that came out in discovery in this case. And there's a reason for that. What evidence do we have that they lack knowledge? What on the record do we have? Well, the case was under seal. And so GSK did not know and could not have known that Merck was actually unable to meet its potency and shelf-life claims. She did not know that Merck had overfilled its vaccine by trying to reach the necessary potency. She didn't know the entire trove of evidence, including all the internal documents, that we uncovered from Merck in this case. And also — The case wasn't sealed in its entirety. It was a public filing. There were components sealed. For your representation, the entire case was sealed, and so no one in the public knew about it? Well, they did not know about any of these facts because they were under seal. The facts were under seal. The case wasn't under seal, but there were certain facts that were accrued that were under seal. Do you want to confer with you? Yeah, I'll just confirm with counsel, but I believe that I will get the answer to that. That is an important statement that we want to make sure the record's clear on? Yes. Only the initial complaint was public. So all of the discovery, everything I just said is correct. So all of those internal documents were not available to GSK at the time. And also it's important to understand that GSK's witness highlighted the limitations in her testimony. She said she couldn't testify to what GSK's strategy was in 2000 because that was prior to her even joining GSK and she had no knowledge of that. That's Appendix 1468. It's uncontested that that witness had no knowledge of or involvement in GSK's mumps business strategy before 2012 and only limited involvement after 2012. Do you take anything from the fact that GSK is not sitting at one of these tables? No, I don't think so. I mean, I wondered that when I came to this appeal as well. I think there are all sorts of reasons why drug companies, you know, they might have arrangements or understandings that we don't know about. But GSK has gotten what it wanted. GSK has gotten approval for the vaccine. From your point of view and your clients are looking to recover damages because of inability to have some price erosion as a result. Exactly, exactly. And from their point of view, that meant they were potentially losing money because they could have been on the market sooner. So is there really an antitrust violation? Who was the victim there? Yes, I understand your clients were victimized from your point of view by the price differential, but the party who lost a big chunk of change would have been GSK, right? Right, and I can't speculate about GSK's motivations or whether there are private understandings that they may have. All I can say is that this one deposition that they're relying on happened at a time when GSK was unaware of all of these facts, where the discovery was under seal and where the witness itself said that it had all these limitations. And I think you can compare that with the contemporaneous evidence from within Merck and from within GSK. And maybe it's worth just highlighting, you know, some of what GSK said internally. GSK sought to get on the market and said that, to itself, its main goal was to establish non-inferiority with Merck. You can see that in Appendix 4668. Their strategy was to establish interchangeability. I'm familiar with GSK's position, and I understand your position on causation, and I understand that. I want to take a step back to Nora Pennington. Sure. And to understand the potential broader implications of what might happen if we rule in the way that you ask us to with respect to Nora Pennington. If we adopt your position, can you help me understand if the result would be that Nora Pennington immunity never applies in the context of a false claim, an allegation that there's a false label claim? No, I don't think you need to go quite that far. Is that the logical next step of what we would be doing? Like, is that essentially what we would be doing? No, well, let me be clear about what our position is. My frontline position, and this is my colloquy with Judge Schwartz, is that our antitrust claim does not depend on the results of efforts to petition or lobby the FDA. But it's also our position that Nora Pennington immunity is essentially a category error here, and I think it's a category error here. And it might not be in another claim, Judge Montgomery Reeves, where I would need to know facts about the hypothetical, but it requires some petitioning. It requires, and, you know, they said it's our burden to show the sham exception, but it's their burden to show this is their defense. It's their burden to show that there's some First Amendment petitioning activity at issue. And this is not a situation in which they solicited the government or initiated some proceeding. It is, as Judge Phipps was, you know, discussing with my friend, it's a situation in which the government comes to a regulated entity and says, hey, we have some concerns. If an FBI agent visits a company to ask questions and answers are given, those answers can be a crime. They're certainly not protected by the First Amendment. So there's a basic category error, I think, in suggesting that incidents to regulation or an inquiry between the government where the government asks questions and a regulated entity is required to give those answers, there's a category error in suggesting that that is petitioning. I mean, we've got this case law. The case law doesn't really trace that so tightly. I think there's something there, but the case law doesn't trace it. But the one thing that we know is everyone seems to say if you get what you want from the government, if you're a regulated entity, then there's no sham exception. It's almost impossible for there to be a sham exception because you wanted something, you got it, therefore no sham. And so it strikes me that if this is petitioning, I'm just reading everything I read is basically no sham exception if you get what you wanted. It is sham if you get what you want. Even if the conduct was by improper means, seems to be what the case law says. If they get what they want, even by improper means, how could it be a sham? I would caution the Court against reading the case law in that way because I think part of the struggle here, if it seems like an odd fit, if the sham exception seems like an odd fit, it's because petitioning is an odd fit here. And I just want to emphasize – And that would take us then to causation, right? Yeah. And Kepler-Pennington is a weird thing because it starts saying we're all about the Sherman Act, not really about First Amendment rights, but then it talks about petitioning later, and then it seems to talk about Pennington where it's really just a causation case. Well, you can understand it as a kind of constitutional avoidance case, but Judge Phipps, I want to answer your question about the case law, about North Pennington. I think it's important to understand no court has ever found North Pennington immunity present on facts anything like these. No court has immunized a company's false or misleading statements about its own products on its label. No court has immunized required disclosures in response to an agency. This is your question. And no court has immunized concealed facts where the competitor did not know about the concealment. So this would be a real stretch. I looked at cases and said, okay, what do we do if there's alleged misrepresentations or misstatements? And as I understand what they instruct we do is say, okay, well, assume those statements never happened. Assume the truth and what would happen if you had the truth. You're talking about Armstrong, Judge Montgomery, right? Yes, yes, yes. So the length of this case sort of gives us something that you may not otherwise have in cases, which is a peek into what did happen, which is nothing. Right. And so picking up on Judge Phipps' point, how do we ignore that if we are analyzing North Pennington? How do we ignore that and say, I understand if we paused and stopped in time, you know, a little bit earlier than the FDA getting all the information and not forcing anything to happen. If we paused in time and said, wait a minute, hold on. If I ask myself do I think the FDA would have approved a label that is false, do I think that's objectively baseless? I might agree with you. Yes.  But we didn't pause in time. We are here today and we see that there's been no requirement that the label be updated or changed in any way. Like how should that factor in? But there is. I mean, there is. I'm glad you're asking about this. There is a requirement that an independent obligation that Merck has, this is the CFR provision that we cite in our brief that requires them to update the label. They say that the FDA has an independent obligation. But actually, if you look at the statute, that's discretionary. It says as the secretary determines. But I think, you know, your question is what do you do about that last part of the sham analysis? And I think you just have to go down a pretty wrong path to get to that. First of all, you have to set aside the fact that the overwhelming thrust of our case isn't about petitioning. Then you have to say that they have met their burden to show this is petitioning, even though they haven't solicited the government in a proceeding. And that is a real stretch. And then I think, you know, Armstrong itself, to answer your question, but Armstrong has some limitations built into it. Armstrong did not go as far as they're suggesting. In Armstrong, you had a proceeding where there was ample opportunity for both parties in an adversarial proceeding to get the record straight. There were findings of fact. And there was a federalism overlay where the court didn't want to question the Pennsylvania state decision that was a contested adversarial decision with findings. Here you have a competitor that's kept in the dark for years. I want to go back to this petitioning point that Judge Phipps was alluding to about being in the position of responding to a government inquiry. And how can you be asking the government to do something if you're not the initiator but you're the responder? But here, if we look at the nature of the communication, what Merck was saying is, I know you're telling us there's a problem. We want to assure you there is no problem, so please don't take any draconian action like pull our license. Right. And a sham can only exist if there is no genuine effort to seek government help. How can we say this? They weren't trying to use the process of responding to seek the government's staying of its hand. Well, I mean, they weren't initiating any kind of proceeding. Well, that's because the government went first. I mean, because, yeah, that's right, the government went first. Right. And so I think it's extremely odd to say that that is an exercise of First Amendment petition rights. And I think you see this in the case law when the court says that an incident of government regulation is not petitioning. And petition, is that the Constitution right when it says petition for redress of grievances? Yes, exactly. So it's not just petition, but you have to show up with a grievance. Exactly. And so if you've already got the label. Yes. I mean, it's a phantom grievance that the label may change. But I guess we're in a regulated space, too, so anything can happen in a regulated space. So maybe that's a ripe grievance anyway. Well, I would go back to my example about the crime of lying to an FBI agent or to make it something a little bit more like this. An OSHA inspector comes to the company and says, we've noticed some violations. You are required to fill out this form and provide answers. It cannot be the providing answers to the government in that form, which is an incident to regulation, is petitioning for grievances. So if Merck had identified first, uh-oh, I think there's an issue, and we're going to self-report to the FDA, let them know that we think there's an issue, but say, here's why we don't think you should make us change our label. Would the result be different? It would be a closer case, but I think the answer would not be different. And I think one case, third circuit case, to look at is the Libertor case. If you look at 868F3 at page 264, what the court there is saying is basically if you've got the conduct in question, and that conduct is anti-competitive conduct, like exclusionary conduct like we have here, the fact that you then afterwards try to launder it through something that you claim to be petitioning, in that case it was submitting a proposed settlement to a court, that that doesn't launder it and make it petitioning. And I think that's really even clearer here. Is there any case law that addresses this scenario that you've been asked about by my colleagues, which is this responding position where the entity is responding to a government inquiry, and that has been evaluated for whether it is petitioning? I think, first of all, it's the dog that didn't bark. I mean, you're not going to find nor Pennington cases that conclude that that kind of thing is petitioning. But I think the best that I can point you to is the cases that say it's an incident to government regulation. And I also think it's just, as Judge Phipps said, it's... And give me a case that talks about if you're responding as an incident to being a regulated entity, that's not petitioning. Give me a case or give me some law. Yeah. So we cite a few cases in our brief on this. I mean, I do want to point out, I would say, first, I would do the Mercatus inquiry and figure out whether you think you need to decide this at all, because the overwhelming gravamen of the case is not petitioning. If we took your view, we're still leaving the... Hypothetically, we'd be leaving the district court without having to make the jury decide about objective baselessness. No, I don't think you'd be making the jury decide, because I think... Well, of course we would, because if we affirm that's exactly what the district court's doing, you say he's giving to the jury the decision of objective baselessness. I think what the Seventh Circuit in Mercatus is saying, I think this is right... I'm talking about what the district court... Right now, what the district court would have to do, but nor Pennington isn't like an evidentiary privilege. That's what the district court said. It was a jury question. I'm sending it to the jury to determine if this conduct is objectively baseless. You're now saying the district court erred by making that conclusion? I think the district court didn't have to... I think the district court was trying to avoid some tricky issues, but I think what the district court could have said, which would have been a lot easier... I'm asking you a question, though. Is your position the district court erred by saying there's a jury question here? No, I don't think the district court was wrong to decline summary judgment. I just think that you could short-circuit the inquiry by saying, using the kind of analysis that the Seventh Circuit did in Mercatus, which is to say the overwhelming thrust of this case isn't petitioning. I understand your position. Can we go back to my incident government regulations? Yes, yes. Have you got a case for me, or give me a page of your brief? Yeah, I mean, page 59 of our brief, the Litton case, that's 700 F. 2nd to 807. There's also the airbag control case, rejecting nor Pennington immunity for statements, quote, in response to statutory reporting requirements or at the request of an agency. I think that's what you have here. Thank you. Thank you. Let me see if my colleagues have any questions. No, no. Thank you very much, Your Honors. You're welcome. Thank you. Good morning, Your Honors. I'm going to try and make a number of points in rebuttal as succinctly as I can. And just for the record, I'm not going to start your time yet. You didn't reserve your time on the record. That's all right, because we knew that you mentioned it to the court prior, and so we were aware that you had, but your colleagues obviously didn't jump up and say she didn't reserve. So it's okay. Go ahead. Thank you, Your Honor. As I heard the plaintiffs argue to you this morning, their case hinges on there being a misrepresentation on the label. There is no misrepresentation on the label. The statements they complain about are on the label today. Under 35504A, FDA has a mandatory duty, and I think I heard my friend on the other side refer to it as discretionary, but it's mandatory. I know the court will look at the language of that statutory provision for itself. It's a mandatory duty to act. That makes this not a case like Lipitor, which he cited to you where there was no such duty to act. The second point I want to make is that the plaintiffs can't prove their case without relying on FDA communications, because their entire theory of this antitrust violation is that Merck misled the FDA to keep misleading statements on the label. I already mentioned those statements on the label aren't misleading. They're still on the label today. But the core of their case is this misleading communications to keep them on the label. Yes, Merck had a task force. Yes, it took credit and said, great, GSK is not coming on the market. But the task force had no idea what was driving GSK's decision making. We know what was driving GSK's decision making, because the GSK corporate representative told us. It was business uncertainty. It was reasons about a quadrivalent vaccine that are in the sealed portion of our brief. GSK was worried about low sales if the market moved to a quadrivalent vaccine. So we know what was driving GSK. It wasn't what the task force at Merck, who had no access to GSK's knowledge, might have been willing to take credit for. But doesn't that, from that point of view, doesn't that simply mean, if we were to come with some resolution like Merck can't use the plaintiff's story, can't use any of the government communications? Should we remand to the district court to say whether or not there's still an ability to prevail? I don't think the court needs to. But if the court wanted to, it certainly could. Those communications are the heart and soul of their theory. That's obvious in their complaint. That was obvious in the way they approached the case at argument, at summary judgment below. Today I heard my friend on the other side telling you what the GSK witness didn't know was about the potency problems in the late 1990s. But GSK has never, there's nothing that suggests potency was ever an issue for GSK or it ever thought about potency. GSK was worried about and needed to develop a sufficiently sensitive assay to get the 96% seroconversion rate. Because of the label that was on Merck's product and they needed to meet it, which included the potency representations. And they didn't know, this is GSK, didn't know, based on what your colleagues were saying, from the sealed record, that in fact Merck's potency information did not map on to the representations on the label. So if I could just clarify one thing, Your Honor, which is that potency and seroconversion are different questions. And so the seroconversion rate is how many samples go from, essentially develop antibodies. And so that is a different, you need a specific assay that can test that. And that's why once GSK got Merck's assay, the ELISA assay, when it became commercially available, GSK was then able to make the showing it needed to show. The problem for GSK was that it didn't have that assay earlier. But that's not an anti-competitive act by Merck. It's not an issue at all in this case. I think Judge Kenney might have been a little bit confused by that. Because he did point to the timing of getting that ELISA assay. But that has never been part of the plaintiff's theory. Their theory is based entirely on there being a false and misleading statement on the label. And just, again, to be clear, those statements are on the label today. If I may make just two other very quick points. It is wrong to say that no court has applied Norr-Pennington in facts like this. If you look at the Cheminor case and you look at the Armstrong case, both of them apply Norr-Pennington and find no sham exception applies. Cheminor at the step one of the sham exception and Armstrong at step two. But what I was asking for was cases, apropos of what my colleagues were asking, where the alleged protected activity were responses to government inquiries. So, Your Honor, I don't know that there are cases that address responses to government inquiries per se. But there are cases that talk about what constitutes petitioning. And it's efforts to get government actors to take certain actions, whatever they are. And that's because at its core, this is an interpretation of the antitrust law. Yes, it's a First Amendment doctrine. But it is an interpretation of the Sherman Act. And what courts say, and this is the Supreme Court in Norr and Pennington and Pree, is that the antitrust laws are about business interactions. They're not about interactions with your regulator. They're not about government efforts to get government to take certain positions or not take certain positions. So if I hear what you're saying, you're saying really Norr and Pennington are constructions, and Pree are constructions of the Sherman Act. They're done in consideration of the constitutional right to petition. But they may actually be broader than the constitutional right to petition because they recognize that it's the anti-competitive acts of businesses, not government entities. And so we're looking at – so even if it's not in the heartland or even within First Amendment petitioning, the Sherman Act has a balance. It certainly doesn't reach that constitutional conduct, unless sham and stuff, but it actually pulls up short of the constitutional to include any dialogue with government regulator, even if that dialogue with government regulator might not be within the scope of the Constitution. Am I tracing you? That is absolutely correct, Your Honor. And the way the courts explain it is that they don't want to chill entities' communications with the government. It's part of democracy, the way courts describe it, to be able to go to your government and say, this is what we'd like you to do, and this is why we'd like you to do it. So it's of no consequence whether it's affirmative action in the first instance or response to a government act if the goal of the communication is to get the government to take an action. That's exactly right. That's how courts have applied it. And I think that's why this court in the Campbell case from a couple years ago talked about there being a very heavy thumb on the scale against application of the sham exception, because the term petitioning in the Norr-Pennington context is meant to apply very broadly. And so for all of those reasons, we would ask that you reverse the decision below. Judge Phipps, you look like you had a final question. No, no. The reason they put the thumb on the scale was the constitutional concerns, not the bounds of the antitrust statute. So it's a weird sort of thing to read the case law. They go in between the bounds of the Sherman Act and then constitutional concerns. We're back to the bounds of the Sherman Act. I think the heavy scale comes from the constitutional concerns, not so much the bounds of the Sherman Act. Well, I wouldn't put it that narrowly, because I think the reason the bounds are broader is to avoid chilling these communications. It's sort of like a prophylactic kind of cushion around what might be otherwise First Amendment-protected activity. And if you look at Norr itself, there are allegations that there were misleading statements made, there were statements made that were false, and the court didn't have any problem in Norr finding that those were indeed protected by the doctrine that now bears the name of that case, Norr-Pennington. For all of these reasons, we would ask that you reverse the decision of the court below. Thank you. Thank you. Thank you, counsel, for your excellent arguments. I'm going to ask counsel to arrange with the court prior to our transcript of today's oral argument, and we'd ask to split the cost between you, and the court will take the matter under advisement.